UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at Pikeville)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 7: 23-020-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| TONY F. WILKINSON, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Tony Wilkinson has felony convictions for drug trafficking and burglary. Following a traffic stop by law enforcement in Knott County, Kentucky, Wilkinson was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He has now filed a motion to dismiss the Indictment, challenging the facial and as-applied constitutionality of the offense based upon the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

The motion was referred to United States Magistrate Judge Edward B. Atkins for issuance of a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B). [Record No. 30] Magistrate Judge Atkins issued his R&R on March 11, 2024, recommending that Wilkinson's motion be denied after determining the restraint on felons' right to possess a firearm under the Second Amendment is consistent with the Nation's history and traditions. Wilkinson objected to this recommendation, arguing that no analogous firearm regulation allows the felon-in-possession statute to withstand constitutional scrutiny after *Bruen*. Specifically, he contends that "a law that can only trace its origins back less than one hundred

years is certainly not consistent with this Nations' historical tradition of firearm regulation." [Record No. 31] Following careful review, the Court will deny Wilkinson's motion.

## I. Background

On February 28, 2022, Troopers with the Kentucky State Police conducted a traffic stop of Tony Wilkinson's vehicle in Knott County, Kentucky. Before being voluntarily disarmed, Wilkinson confessed to possessing a loaded Davis Industries Model D-22, .22 caliber Derringer pistol that had been shipped or transported in interstate commerce.

In 2004, Wilkinson was convicted in the Letcher Circuit Court for third-degree burglary and theft by unlawful taking. A decade later, Wilkinson was convicted in the Perry Circuit Court for first-degree drug trafficking. And in 2016, Wilkinson was convicted for trafficking in controlled substances and being a persistent felony offender under Kentucky law. Based on these felony convictions, Wilkinson was charged following the February 2022 traffic stop with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## II. Discussion

The Second Amendment protects "the right of the people to keep and bear arms." U.S. CONST. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and later in *McDonald v. Chicago*, 561 U.S. 742, 791 (2010), the Supreme Court clarified that this protection guarantees "the right to keep and bear arms for the purpose of self-defense." Likewise, the Sixth Circuit has recognized that *Heller* framed the core right as one belonging to "law abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Greeno*, 679 F.3d 510, 517 (6th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

In the years following *Heller*, courts deployed a two-step framework for evaluating Second Amendment challenges. Courts first asked "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood." *Greeno*, 679 F.3d at 518. And if a court determined that the challenged law burdened protected conduct, it applied means-end scrutiny. *Id*. at 2125.

Recently, the Supreme Court held that the Second Amendment also protects "an individual's right to carry a handgun for self-defense *outside the home*." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). In reaching this conclusion, the Court replaced the prevailing test for assessing laws that restrict the right to bear arms. *Id*. at 2125–26. The Court also determined that, "[d]espite the popularity of this two-step approach, it is one step too many." 142 S. Ct. at 2127. Instead, it held that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" if the amendment's text protected the conduct. *Id*. Additionally, the *Bruen* Court concluded:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

But as the Supreme Court has reaffirmed over time, "the right secured by the Second Amendment is not unlimited." *See, e.g., Heller*, 554 U.S. at 626; *Miller v. United States*, 307 U.S. 174 (1939).

### A. The Constitutionality of the Felon Dispossession Statute

Title 18 of the United States Code, section 922(g)(1), renders it unlawful for any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Reviewing the history of the statute is a natural starting point in analyzing Wilkinson's argument.

Congress originally passed the Firearms Act of 1938 which prohibited certain felons from *receiving* firearms. At the time, the statute only covered felons convicted of crimes like murder, rape, kidnapping, and burglary. But in 1961, Congress passed the first law to prevent all felons from receiving a firearm through interstate commerce. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). Congress strengthened this prohibition by banning all felons from *possessing* a gun that had traveled in interstate commerce less than a decade later. The federal felon-in-possession law in its current form criminalizes possession of a firearm by any person who has been convicted, in any court, of a crime punishable by imprisonment for a term exceeding one year.

Wilkinson broadly argues that § 922(g)(1) is unconstitutional on its face under *Bruen* because it is a "modern law that has no roots in how the United States has treated firearms and firearm regulations." [Record No. 23] But as the Magistrate Judge correctly observes, a facial challenge "require[s] the Defendant to argue that the felon-in-possession statute is unconstitutional as applied to *all felons* covered by the statute." *United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010). To succeed, a movant "must establish that no set of

circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

To make this showing, Wilkinson claims that "wholescale disarmament of this incredibly broad and heterogeneous class—all felons—cannot be squared with the Constitution's text and history." *Id*. He further contends that, because the provision "can only trace its origins back to 1938," it is "surely not consistent with this Nation's history of firearm regulation." [Record No. 23]

It is difficult to square Wilkinson's arguments with the body of case law that defines the contours of the Second Amendment. Instead, the provision has long withstood judicial scrutiny. For example, the Supreme Court in *Heller* emphasized that its opinion "should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. In the years following *Heller*, the response to the Supreme Court's statement about felon-in-possession laws was uniform across other circuits that likewise upheld § 922(g)(1) as constitutional. *See, e.g., Medina v. Whitaker*, 913 F.3d 152, 155–160 (D.C. Cir. 2019); *United States v. Anderson*, 559 F.3d 348, 352 n.6 (5th Cir. 2009); *United States v. Battle*, 347 F. App'x 478, 480 (11th Cir. 2009). The Sixth Circuit has reached a similar conclusion when asked to decide the statute's fate. *See, e.g., United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008); *United States v. Khami*, 362 F. App'x 501, 507–08 (6th Cir. 2010); *see also United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) (stating in dicta that "[a]fter *Heller*, this Court affirmed that prohibitions on felon possession of firearms do not violate the Second Amendment").

But as other defendants across the country begin challenging laws as violative of the Second Amendment's guarantees following *Bruen*, there is renewed debate concerning

whether *Heller's* commentary regarding prohibitions on felons possessing firearms is merely dicta and, therefore, not binding on lower courts. Even if so, courts within the Sixth Circuit still "are obligated to follow" *Heller's* unequivocal statement on the validity of the felon dispossession statute absent a "substantial reason for disregarding it." *See United States v. Marlow*, 278 F.3d 581, 588 n. 7 (6th Cir. 2002).

Although the Supreme Court altered the framework for evaluating challenges under the Second Amendment, the *Bruen* test is merely a more direct iteration of the original opinion. After all, its shared first step "demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. Therefore, assuming "*Bruen* did not disrupt the first step of the two-step framework predominant among circuit courts after *Heller*, it is difficult to see why *Heller's* dicta about felon-in-possession laws would be undermined." *See United States v. Risner*, Criminal Action No. 7: 22-022-REW-EBA (E.D. Ky. 2023). Further, six justices of the Supreme Court foreclosed the notion that *Bruen* undermined *Heller's* affirmation of the statute dispossessing felons as a valid exercise of congressional power.

The undersigned acknowledges that the Sixth Circuit, to date, has held only that no binding precedent directly "addresses the constitutionality of § 922(g)(1)" in the aftermath of *Bruen*. *United States v. Bowers*, 2024 WL 366247, at *3 (6th Cir. Jan. 31, 2024). Although the Sixth Circuit decided *Bowers* under a plain-error standard of review, the decision seemingly endorsed the longstanding prohibition on the possession of firearms by felons by acknowledging *Heller's* proclamation that the statute "remain[s] presumptively lawful." *Id*. Without clear contrary guidance from the circuit, this Court declines Wilkinson's invitation to depart from this presumption.

Regardless of whether the commentary in *Heller* amounts to dicta, this Court sees no reason to disregard its clear statement regarding the constitutionality of the felon disarmament statute. Therefore, the undersigned affirms that "*Bruen* did nothing to change the prohibition on the possession of firearms by felons, which remains well-settled law." *See United States v. Davis*, 2023 WL 373172, at *2 (E.D. Ky. Jan. 24, 2023); *see also United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023) ("The longstanding prohibition on possession of firearms by felons is constitutional."). Thus, Wilkinson's facial challenge of the provision's constitutionality fails.

### B. The As-Applied Constitutional Challenge of § 922(g)(1)

Wilkinson also claims that even if the Court declines to hold the felon dispossession statute unconstitutional on its face, the statute is unconstitutional as applied to him. In analyzing Second Amendment challenges, some courts first determine whether a defendant deprived of the constitutional right to possess a firearm is one of "the people" it protects. After all, the Supreme Court noted that the respondents in *Bruen* were "part of *the people* protected by the Second Amendment because they were "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. But should courts analyze whether the government can categorically disarm felons as a class solely based on their shared lack of virtue as law breakers? At least one judge in this district has acknowledged that "history and *Heller* counter the conclusion that the Second Amendment is a *civic right*." *United States v. Goins*, 647 F. Supp. 3d 538 (E.D. Ky. 2022).

The undersigned, like others before, is unconvinced that a textual analysis of the phrase "the people" is the appropriate starting point for analyzing an as-applied challenge under the

Second Amendment.[1]  And as Wilkinson points out, *Heller* embraced an individual rights approach to Second Amendment challenges.[2]  As a result, this Court will proceed pursuant to that guidance.

The appropriate initial step under *Bruen* instead asks a question easier to answer—specifically, whether § 922(g)(1) regulates an individual's conduct that is protected by the Second Amendment.  Because the amendment's plain text encompasses possession of a firearm, the answer here is clear.  Wilkinson's purported possession of a pistol in his vehicle falls within the plain text of the amendment.  Therefore, the government must justify its prohibition on felons possessing a firearm by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126; *see also Oakland Tactical Supply, LLC v. Howell Twp.*, No. 21-1244, 2022 WL 3137711, at *2 (6th Cir. Aug. 5, 2022).  Central to this analysis is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  *Id*. at 2133.  Of course, some "historical analogies . . . are relatively simple to draw, [but] other cases implicating unprecedented societal

---

[1]  *See United States v. Silvers*, 2023 WL 3232605, at *5 (W.D. Ky. May 3, 2023) ("It's far more natural to conceive of the Bill of Rights as presumptively protecting each of us—unless and until a law validly restricts those rights.  A felon, for example, loses a right (such as the right to vote) only if he is convicted and the government has enacted a law that takes that right away. . . . These are rights the defendants previously enjoyed but stood to lose.  A person could become eligible to lose a right by violating the law. . . . But that person's conduct alone didn't automatically cost him or her that right without some further operation of law.")

[2]  "While *Heller* and *Bruen* repeatedly discussed the Second Amendment in the context of law abiding-citizens, neither opinion clarified which groups qualified as 'the people' as that term appears" in the amendment's text.  This has "led to dueling interpretations by district courts nationwide on the question of whether 'the people' should be read more broadly, such as in the context of the First and Fourth Amendments, or narrowly, such as in the case of voting rights."  *See United States v. Hill*, 2022 WL17069855, *1 (S.D. Tex. 2022).

concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. But ultimately, the government's burden is to "identify a well-established and representative historical analogue, not a historical twin." *Id*. at 2133.

Wilkinson contends that, "even after paying his debt to society, [he] is still being punished for his non-violent crime." [Record No. 23] As applied to him, Wilkinson argues that § 922(g)(1) is not consistent with this Nation's historical tradition of firearm regulation because "[t]here is no circumstance under which it is constitutional to permanently deprive an American citizen [like him] of a right guaranteed to him by the Constitution." [Record No. 23] Further, according to Wilkinson,

> No historical law ever disarmed anyone because the crime was "serious" or the person lacked "virtue," nor did disarmament ever depend on whether the crime was classified as a misdemeanor or felony, the actual sentence imposed, or the existence of a cross-jurisdictional consensus.

[Record No. 31] Ultimately, Wilkinson argues that the United States has failed to meet its burden to prove otherwise because "neither the federal government nor a single state barred all people convicted of felonies from possessing guns until the twentieth century." *Id*.

The best evidence that Congress has the power to strip Wilkinson of his Second Amendment rights would be Founding-era laws that similarly deprived felons of possessing firearms. In search of a comparable statute, an examination of American history and traditions for regulating firearms is aided by reviewing the anteceding English history and customs imported by the Nation's founders. After all, "the Second Amendment codified a right inherited from our English ancestors." *See Goins*, 647 F. Supp. 3d at 551 (quoting *Bruen*, 142 S. Ct. at 2138–39).

The United States emphasizes that the well-established English tradition of arms regulation dates to the fourteenth century, which has been ably catalogued by courts considering similar questions. *See e.g., Bruen*, 142 S. Ct. at 2138–39; *Goins*, 647 F. Supp. 3d at 546–554; *United States v. Risner*, Criminal Action No. 7: 22-022-REW-EBA (E.D. Ky. 2023). For example, as a legal scholar observed, "[o]ne English tradition from which American tradition developed was that of disarming violent and other dangerous persons." *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 258 (2020). This regulation was premised on the age-old notion that society can restrict access to firearms for those it deems likely to endanger public safety.

Additionally, the Statute of Northampton in 1328 prohibited "carrying arms in an aggressive and terrifying manner." *Id*. at 262; *see also Kanter v. Barr*, 919 F.3d 437, 456–57 (7th Cir. 2019) (Barrett, J. dissenting) (citing *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Although history indicates that this law became obsolete over time, "Parliament responded by writing the predecessor to our Second Amendment into the 1689 English Bill of Rights." *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 128 S. Ct. at 2798).

Around this time, the English likewise sought to restrict the ability of Catholics to bear arms, believing they posed a risk of revolt and public disturbance because "they bore loyalty to a foreign sovereign, the Pope, rather than the English crown." *Goins*, 647 F. Supp. 3d at 553 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. OF L. & PUB. POL'Y 695, 723 (2009) ("In short, the stated principle supporting the [arms] disability [imposed on Roman Catholics] was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to [commit]

violence against the king."). Further, during the most relevant English period for understanding the precursor to the Second Amendment, "officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom'" after passage of the Militia Act in 1662. *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

The Magistrate Judge emphasizes that the import of English tradition for disarming groups perceived as threatening to public safety or the general peace also informed early American arms laws. For example, Catholics were disarmed in Maryland and Virginia in 1756 and later in Pennsylvania in 1759 for similar reason as those previously in England. *See* Greenlee, 20 WYO. L. REV. at 265; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007).

However, laws disarming disaffected individuals who were perceived as a threat to the general peace and order by extension, addressed more than religion. As the colonies became independent states, many passed loyalty statutes disarming individuals considered unwilling to respect the rule of law. *See Range v. Att'y Gen. United States*, 69 F.4th 96, 101, 125 (3d Cir. 2023) (Krause, J., dissenting); Greenlee, 20 WYO. L. REV. at 264. For example, Pennsylvania passed a law allowing officials to disarm dissidents who refused to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state" in 1777. *Range*, 69 F4th at 125 (Krause, J., dissenting); *see also* Greenlee, 20 WYO. L. REV. at 265. This statute "is especially illuminating because Pennsylvania's 1776 constitution protected the people's right to bear arms." *Range*, 69 F.4th at 125 (Krause, J., dissenting).

During this period, slaves and Native Americans were also disarmed "as a matter of course" because they were "thought to pose more immediate threats to public safety and

stability." *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *see also Goins*, 647 F. Supp. 3d at 552 ("Both before and after the revolutionary war, states disarmed slaves and Native Americans."); Greenlee, 20 WYO. L. REV. at 250 ("[C]olonial disarmament efforts focused on those perceived as posing a dangerous threat, including Loyalists to the British Crown, slaves, freedmen, and Native Americans."); *Range*, 69 F.4th at 122 (Krause, J., dissenting) ("[S]ome of the earliest firearm laws in colonial America forbid Native Americans and Black persons from owning guns[.]"). "[M]any states even constitutionalized the disarmament of slaves and Native Americans." *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). As part of a broader historic pattern, "[t]hese laws arose out of fear that slaves and Native Americans would use guns to revolt." *See Goins*, 647 F. Supp. 3d at 552 (citing *Kanter*, 919 F.3d at 458 (Barrett J., dissenting)). For emphasis, "[w]hile these practices have no place in modern America, they do represent a historic tradition of disarming groups that the legislature views as threatening the public safety." *Id.*

This brief historical survey leads to one conclusion: the history and tradition of this country's arms regulations confirms that historic analogues exist to justify the comparably modern legislative decision to disarm felons deemed inherently dangerous to society by Congress. *See* Saul Cornell & Nathan De-Dino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004). Further, courts reviewing as-applied challenges to felon-in-possession laws generally start with a strong presumption that Congress was correct in deeming felons to have a proclivity for violence or a tendency to disturb the peace. *See Binderup v. Atty. Gen. United States,* F.3d 336, 351 (3rd Cir. 2016) ("[W]e will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.") This Court

presumes that Congress reasonably deemed a person such as Wilkinson a threat to public safety by classifying him as a felon.

Ultimately, the Court notes that Congress was undoubtedly aware that "drugs and guns are a dangerous combination" by stripping felons like Wilkinson of their right to possess a firearm. *See Smith v. United States*, 508 U.S. 223, 240, 113 S. Ct. 2050 (1993). Serious drug offenses, like distribution or possession with intent to distribute, are inherently dangerous and often violent offenses that justify disarming those who commit them. *See United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011). And a conviction for burglary signals the defendant is equally, if not more, dangerous. Therefore, supported by a base of historic analogues that applied restrictions for possessing a firearm to individuals perceived as dangerous or violent akin to § 922(g)(1), Wilkinson's as-applied challenge fails under the *Bruen* test.

### III.

This Court reviews *de novo* those portions of the Magistrate Judge's R&R to which timely objections are made. Defendant Wilkinson timely objected to the Magistrate Judge's determination that § 922(g)(1) is constitutional on its face and as applied to him. However, after conducting a *de novo* review, the undersigned adopts United States Magistrate Judge Atkins' finding that § 922(g)(1) is constitutional under *Bruen*. The United States has carried its burden of showing historic analogues that similarly prevented certain groups viewed as dangerous to society and public order from possessing a firearm. Therefore, it is hereby

**ORDERED** as follows:

1. The Report and Recommendation of United States Magistrate Judge Edward B. Atkins [Record No. 30] is **ADOPTED** and **INCORPORATED** here by reference.

2. Defendant Wilkinson's objections to the Report and Recommendation [Record No. 31] are **OVERRULED**. The Court finds that 18 U.S.C. § 922(g)(1) is constitutional on its face and as applied to Defendant Wilkinson.

3. Defendant Wilkinson's motion to dismiss the Indictment [Record No. 23] is **DENIED**.

4. This matter is assigned for a final pretrial conference on **Tuesday**, **April 16, 2024**, beginning at the hour of **1:30 p.m.**, at the United States Courthouse in Pikeville, Kentucky. A new trial date will be scheduled at the time of the final pretrial conference.

Dated: April 8, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky